Thank you. Mr. Brown, good morning. Good morning. My name is Simon Brown. I represent Dustin Moss. I request to reserve two minutes for rebuttal. You may. Thank you. I would like to start with the issue of standing, which was not addressed in the district court suppression order. As the court knows, in 2016, in U.S.A. v. Stokes, this court left open the issue of whether a defendant like Mr. Moss, who was neither the sender nor the addressee of a mail package, could assert a privacy interest in that mail under facts similar to these. The Stokes court acknowledged that the facts there were not on point with the lower court decisions in Allen v. Bates. I submit that this case is analogous or on point with both Allen v. Bates, the lower court decisions in this circuit, and under the factors established in McGuire v. Stokes, Mr. Moss had standing. So why are you starting there? Do we actually have to decide the question of whether he had a reasonable expectation of privacy in either of these packages of drugs that were mailed to him from Arizona? It seems to me the government has offered grounds for affirmance that simply bypass that issue. There was a warrant for one. As to that one, there may be an issue as to the warrant. As to the other one, they have at least two different theories. One of them was a private search theory. The other of which is the package went to a private individual, and he called the police, and the police had every reason to think he had authority to authorize them to open the package. And when they open it, they find this light powdered substance. So why are we starting with an issue that probably doesn't need to be addressed? I appreciate that. So would you move on? Of course. Well, let's address the second package, the one in which Mr. O'Rourke, through his lawyer, notified law enforcement. That package, it needs to be recognized that this happened four days after Mr. O'Rourke and Moss were arrested. O'Rourke was released, Moss was in jail. Consistent with what happened four days earlier, a package arrives at Mr. O'Rourke's apartment. It cannot be ignored that the law enforcement at that point knew. They knew a lot. They knew a lot more than they did four days before. They knew that O'Rourke had acted as a bailiff for Moss on that first occasion. He had received the package, turned it right over to Moss in exchange for drugs. And O'Rourke told them that he, if things had not gone badly four days before, he probably would have done the same thing. It's our position that law enforcement should have sought a warrant for that second package. Mr. O'Rourke, in fact, never even saw the second package. It was his friend, Ms. Krimpler, who, against his instructions, retrieved the package and opened it. Law enforcement never even talked to Ms. Krimpler. But she's not law enforcement and she opened it. Isn't the cat out of the bag, so to speak, right there? Well, we don't, the issue with the private search exception, Your Honor, is whether law enforcement exceeded what she did. It does seem like you sort of want us to rule you can have your cake and eat it, too, that a someone engaged in a crime can hide their involvement from the police by making it look like something belongs to someone else by having it directed to them. And then when the police act on that representation by the defendant, that the thing was to go to someone else, the criminal can turn around and say, ah, wait, that's mine. They shouldn't have been fooled by me. That seems sort of an odd rule. Well, it's not a savory situation. I agree with you there. But courts have addressed this very issue, Your Honor, and they have to apply the factors. And it's been recognized that simply because you allow someone else to receive a package on their behalf, you don't necessarily abandon any rights to privacy in it. Can I go back to your argument? It's not clear to me, based on your argument that the government should have gotten a warrant, when the government should have gotten a warrant. Are you saying after they received the phone call from Mr. O'Rourke's counsel that there was a suspicious package? Or are you saying earlier, before anyone received the package? When they received a phone call from the lawyer for Mr. O'Rourke, they should have reflected on the situation and said, okay, this is the second heavy package from Las Vegas to Mr. O'Rourke. How do they know that? Because after Mr. O'Rourke was arrested on April 19th, he... No, no, no. Did the lawyer say it's a heavy package and it comes from Las Vegas from the same address as the package you earlier had gotten the warrant from? I don't believe the police have any basis to know that that package was in the mail and about to be delivered to Mr. O'Rourke. They did not know about the second package. All right. But there was no exigency here. I mean, they easily could have segregated the package, thought about it and recognized, okay, here's four days later, here's another package from Las Vegas, Nevada to Mr. O'Rourke of all people, the same person who told them the whole plan, the whole scheme four days before. And so they should have considered the issue of does he really have a parent or actual authority to consent under these circumstances? Suppose you have someone engaged in a crime, they take the contraband and they give it to their pal who's actually engaged in the crime and they have a deal and he tells the pal, the pal says, I'll keep this secret so you get better facts than you have here in terms of agreement. And the pal has second thoughts, says, I don't want to go to jail. So he calls up the police and takes them in and says, look what I've got from my guy that he asked me to hold secret. He's committing a crime. I don't know of any case law that would say there's something improper with that by the police, by accepting the second guy, deciding he's going to turn over everything and give them permission maybe to search his house too because he was keeping someone's gun in it. How is this any different? Well, this is a package, not a residence. I wouldn't disagree that O'Rourke could... Well, a residence is a heightened Fourth Amendment concern. Right, but I think O'Rourke would certainly be able to consent to a search of his own residence. Here, it's just the... He could open the package, couldn't he? It was addressed to him. And when he opened it, he didn't have any obligation to anyone to call up and consent to a search of his actual residence and there's the package sitting on the dining room table open. Well, I think in this case, O'Rourke told him I had no interest in the first package. I just accepted it and right away turned it over to Moss. But he accepted it. He did as part of a plan to... And then he decides, I don't like this criminal plan. Well, I think that the courts have recognized, Your Honor, where there's close supervision or close following of the package, which we certainly have here with respect to the first package, that Moss would have standing to object with respect to whether or not to call in here and have the package. I think Moss would still have an argument that that's my property. And that's what he testified to. That's my property. And O'Rourke, like in Adeline, O'Rourke is not saying, hey, it's mine as well. It's not like the Gibbons case I think in the Fourth Circuit where it was mailed to a corporation, to a particular employee, but then the president said, well, I have the right to open this too. I think under the particular facts of this case, that Moss had standing and that the police should have, or law enforcement should have... Can I answer this? Expectation of privacy is the only thing that I can say. Why does someone have an expectation of privacy over a package that's not addressed to you or in which you are either the sender or the receiver, according to the package? Well, other circuits have held that one does not. Well, why should we hold different? Well, I think that the court has set out a set of criteria to examine, each of which I think is favorable to Mr. Moss as to, in this circumstance, especially with the first package, he had an expectation of privacy and given his close monitoring of its delivery, I mean, he never really let Mr. Moss out of his sight. He could be, any time he monitors a package, even though it's not addressed to him, he has an expectation of privacy in that package? I think under the factors of, if you apply the factors to the first delivery of the package, I think it's a clear case that he does have an expectation of privacy. You know, I could maybe think of circumstances like a package gets mailed to your brother and you've said to your brother, it's easier for you to get it because I just have a post office box and you've got a house and it can be delivered. Maybe a close family relationship, difficulty in accepting mail, that might argue against a flat rule in this area, but I don't see that your case presents any such circumstances. Are there any? Well, I think with respect to the first package, yes. I mean, the only reason O'Rourke received the package is because he agreed. I will... No, no, no, they're utter strangers to each other. They were until that day, I agree, yes. But what happened there, Moss goes to his apartment... And a third party is the one who arranges it. It's not a personal arrangement. Well, I don't think that's fatal to the expectation of privacy, especially where Moss, Your Honor, went to his apartment. They sat around waiting for the package. It didn't timely arrive. O'Rourke finds out, I have to go to the post office. Moss follows him in his car. Okay, can we turn to the warrant issue? Yes, Your Honor. Our position is that the warrant was sufficiently described the item to be searched. It did not. It described a white five ounce envelope. So that's undisputed, but what about Leon? On good faith? Yes. Well, that's... You know, there are situations, as the court knows, that where if a reasonable law enforcement officer would not have acted as this one did, then Leon doesn't save the warrant. This case is more like Gros and the Crabtree case I cited, and Shepard... Well, not Shepard, we're talking about good faith, but where you're describing something that is total. Good faith. Where you're describing something where it's completely off. It's not like one number is off on an address, or an address is omitted, like in Bonner and Vega Frida Roma. This is a completely inaccurate warrant, where if the postal inspectors had taken one glance at it, they would have realized a mistake. And for that reason, Leon does not save the warrant. Thank you. Thank you. Mr. Davis, good morning. Good morning. May I please inquire, my name is John Davis, representing the government. Beginning with the warrant, Your Honors, the search warrant in this case, and the defect in it, is controlled by the Bonner case. There is no question here that there was a description sufficient to enable the officer, Officer Sweet, Postal Inspector Sweet, to identify the package he was going to search. In fact, he'd already identified it, he'd segregated it, it was sitting in the Postal Inspection Service headquarters, and there was just no risk that the wrong premises was going to be searched here after that error. There was also no reasonable probability that some other premise would be searched. The only package that was, the package that was wrongly described did not even exist. Is it the issue here, sort of, how do we want to incentivize police behavior? In other words, do we want the norm to be that after applying for a warrant, one reads the whole warrant before executing it to make sure you understand the property that's being searched? Or do we want the norm to be somewhat more nuanced or different than that, that we would still find good faith in certain circumstances when the officer obviously didn't read the entire warrant? Your Honor, we do want the police always to read the entire warrant, and we also want the prosecutor... How about the U.S. Attorney's Office? And the U.S. Attorney's, I was just about to say. Could you explain to me this incredibly sloppy practice from the U.S. Attorney's Office in New Hampshire? It is embarrassing Your Honor. How did it happen? So, as the Court knows, attachment A is attached to the application for the warrant. It is also attached to the search warrant. It is the identical document. It should be the identical document. Here it wasn't. The correct one was submitted with the application. That apparently was what the judge saw, but as to the warrant itself, some other attachment A that was not the correct attachment A was attached. Then the agent didn't even bother to read the warrant. The agent did read the application. Read the attachment A for the warrant that was issued. Why should the agent be in the role of guarantor of the U.S. Attorney's Office not making mistakes like this? He shouldn't be. The U.S. Attorney's Office did make a mistake. How did it make the mistake? So, Your Honor, the original attachment A was typed by the agent when he drafted the application and the affidavit. That attachment A was what he sent to the AUSA the night before. That attachment A was what the AUSA appended to both the affidavit and the application. That attachment A was what the AUSA sent to the court for review just before going down to swear out the warrant. The error occurred, Your Honor, when the papers were being prepared and I believe or surmise that the AUSA clicked the wrong affidavit on his directory, I'm sorry, the wrong attachment A from a previous package search warrant and printed that out and put that one on, attached it to the warrant. So you were lucky he didn't have your home address on his computer. Correct, Your Honor. It probably could have been worse. But the correct attachment A was sent to the court. The correct attachment A was on the application that the agent did review and the only mistake made, and it was a mistake, was that apparently neither the AUSA nor the postal inspector also reviewed the attachment A that was attached to the search warrant. When you say review, what do you mean? Because it does seem significant here to me that this was an all or nothing premises description. They were asking for a warrant for one thing. You're either going to get it or you're not going to get it. Very different than a situation where you're asking for a warrant to search 16 different things and three rooms in a house. The magistrate might give you some rather than the other, and so you've got to really pay attention to what the description is of the property. Secondly, it seems that the two exhibits looked to the eye quickly alike. In other words, they were roughly the similar length. They were a description of a package. So those to me to be significant facts that I'm not sure we should be comfortable with the word review. If you mean did he read it word for word, clearly he didn't. But how do we know he didn't flip the page over to see, is my attachment A and it looked like it? I believe he testified that he didn't. That he didn't take that additional step. But I certainly agree with you that even had he done that, he might have missed it because on the face of it, the only real difference is in the tracking number, and then you read it and then you realize it's something completely different. I dare say the second attachment A was written using the first as a form. That's probably exactly what happened. My concerns may be a little bit different. A court issues an order based on an application made before it, and then when it comes time to serve the order, because of the sloppiness of the U.S. Attorney's Office, a different order gets served. This sort of mistake can happen outside of the context of search warrants. It can happen in all sorts of other situations. And as I said, I don't think the agent should be put in the role of being the guarantor of the work done by the prosecutor for the state of New Hampshire and federal prosecutor. So I would feel better if I knew there were procedures that would stop this from happening again. You know, this court occasionally writes opinions about best practices. I'm not really interested in doing that, but I am interested in seeing that such mistakes don't happen. And as Judge Kayada says, how does one incentivize the U.S. Attorney's Office not to make such mistakes? Your Honor, this mistake is known in our office, and there is no additional procedure, written procedure, that's been introduced. But it is understood that every warrant that goes down, the AUSA is responsible for the papers in that application and for reviewing them. We agree this is an embarrassing mistake, but we don't agree that the mistake had any role in the issuance of the search warrant or any role in the execution of the search warrant. And under the circumstances here, there is simply no deterrent effect that that warrant suppression. We shouldn't have made the error, but there is no question there was good faith in this case. And there is no reason, based on the reasoning behind the exclusionary rule, to suppress. Tying briefly to the issue of consent, Your Honor, in the second package, this is a case where there is a very, very loose series of assumptions and unspoken expectations, falling far short of a bailment agreement or a bail or bailee relationship. And there are no instructions and no communications when this second package arrives. And the only effect that that has on the recipient, Mr. O'Rourke, is to cause him to freak out, basically. He won't even come out and look at the package. He quickly instructs his girlfriend to fold it up and put it back in. And he calls immediately his attorney. He wants no part of that package, and he wants the police to assumed when the package was sent to Mr. O'Rourke under those circumstances. I would add, Your Honors, that for the Postal Inspection Service, the rule must be that an addressee can consent to the search of his own mail. That's what happened here. That's what happens in many cases. I suppose there could be a case with a commercial post office box company that has well-posted contracts and understandings and privacy agreements where the government could not accept consent. But at least the basic mailing, the world of mail coming to people's houses. Or the addressee is blurred, and all you have is the address. And let's say several people live at the address. Can one of them, if you can't tell the name of the person, can one of them consent? With more investigation, perhaps. I think that's a more difficult question. That's why I asked. With a few questions, perhaps. Do you live here? Are you always here? Is this your house? But in this case, with a clear, there's one recipient, Mr. O'Rourke, the Postal Inspection Service has got to be able to rely on that. There's no other way to run the mails. Lastly, Your Honor, I wanted to turn to standing. Judge Lynch, you began by why are we talking about standing? I do think that standing is important about packages. Can I back up? Yes. You know, the Supreme Court about 15 years ago told courts stop using the term standing. And yet, your side's briefs use it. Could we talk about not standing but reasonable expectation of privacy? Well taken, Your Honor. Yes. The question of reasonable expectation of privacy regarding mail packages is more important today than ever because of the dark web and because of cryptocurrency. More and more, the UPS, Federal Express, and the U.S. Mails. And the rules about expectations of privacy, in particular, rules that allow courts and litigants to avoid some of the substantive arguments we have to go to, those rules are very important. Okay. You've just argued that the name, the addressee, that the Postal Service, any delivery service, has to rely on that person being able to consent. Yes. So I assume you're arguing that person, there ought to be a per se rule that that person has a reasonable expectation of privacy under all circumstances. And that also doesn't answer the question of whether anybody else might have a reasonable expectation of privacy. So you're urging us to come up with per se rules. You say that's important in this era of package delivery. And I'm wondering whether it's so clear that we should be coming up with per se rules. It's not clear, Your Honor. And it is fact specific. All I'm saying is that there is reason to consider determining the second package issue, for instance, based on what used to be called standing. Because the preliminary issue did not have to deal with the questions of third party consent and private search doctrine. You've got a very savvy district court judge there. And if he's reluctant to get into this. I don't second guess his judgment. I say only from the government's perspective, on the second package at least, the reasonable expectation of privacy question is not close. Suppose a woman who actually opened the package thinking she was doing a favor for her friend who was about to go off to a rehab center, suppose instead of saying something to him, she had seen the white palette calls to the police. Does she have a reasonable expectation of privacy such that the police can rely on her having called them and consented to them searching it? I don't know if she has a reasonable expectation of privacy. She is a citizen observing a crime, and a crime that's now being revealed. She's habitually picked up his mail from this box and opened packages for him. He doesn't give her any instructions one way or the other about this package. He doesn't say to her, don't. I'm varying the facts a little bit. She has no reasonable expectation of privacy in the package. She does have the right to alert the police to the plain view evidence and to ask the police to come and seize the evidence. And do they then have to get a warrant? They don't if she has already opened it and what they do does not exceed the scope and extent of their search. So the private search doesn't depend at all on expectations of privacy? No. Okay.  Thank you. You have two minutes. Thank you. I'd like to briefly return to the issue of the good faith exception. And the point was made during the questioning of the government that this was really an all or nothing sort of equation with the warrant. It's not as if the mistake in attachment A described in part what they really wanted to look for. It describes something completely different. And there is a case cited in the government's brief, U.S. v. Quasar, Q-A-Z-A-H, where the point was made, well, with a similar circumstance where the attachments were mixed up in the process. And one of the points why they upheld it on, I believe, on good faith was that, well, it did partially describe some of the things they wanted to seize, and they did seize those things. And it described, it mixed up the residences of two co-defendants, and that is not the case here. Secondly, the case of Massachusetts v. Shepard, the Supreme Court case, that was upheld on good faith in part because it was placed on the magistrate because the magistrate had assured the detective who sought the warrant for a homicide investigation, okay, there's something irregular about this warrant, but I'll fix it. Don't worry about it. Those aren't the exact words. But we don't have either of those here. We don't have any allegations that the magistrate made a mistake and that the law enforcement officer relied on the magistrate, nor do we even have a partial description of what was actually searched. Thank you. Thank you.